state, so long as the same shall be owned and occupied by the debtor as such homestead."

By the act of 1870 [page 6, § 1], "clerks', laborers', or mechanics' wages or for money due and owing by any attorney at law" are excepted from the benefit of the exemption.

There is no provision in the statute prohibiting the alienation, sale, or mortgage of the homestead, or of any of the other property exempted by the statute from judicial sale. Nor is there any provision respecting the mode of conveying the homestead, but there are general provisions relating to the manner of conveying real property, in conformity with which the mortgage here in question was executed.

Under these circumstances I perceive no difficulty in the question here presented.

The legal title to the lots occupied as the homestead being in the husband, he and his wife, by joining in an absolute conveyance thereof, might, undoubtedly, make to the purchaser a perfect title. There being no restriction upon the right of disposition, I think it equally clear that they could in this mode make a valid mortgage upon the homestead. If so, then such a mortgage can and should be enforced.

The provisions of the statute above mentioned, respecting the exemption of the homestead from sale upon execution or other judicial process, plainly refer to executions or process upon general judgments, not to decrees upon foreclosure of a valid mortgage upon the homestead. The language exempting the homestead from judicial sale can no more be construed to prohibit the owner from making a mortgage upon it than from making a sale of it. Similar language is employed in section 530 as to the personal property thereby exempted from judicial seizure and sale, and yet it could scarcely be contended that a valid mortgage might not be made by the owner of such property.

The exemption in both cases is for the benefit of the debtor and his family. It may be waived. And when the husband and his wife unite in the execution of a mortgage upon the homestead for a valuable consideration received by them or either of them, the right to the exemption is thereby waived in favor of the mortgagee.

I perceive nothing in the legislation of the state which prescribes a particular method of conveying the homestead or requiring an express waiver of the homestead right. In Iowa the statute in terms provides that no sale or conveyance of the homestead shall be of any validity, unless both husband and wife concur in and sign the conveyance, and yet it is held that no express waiver of the homestead right is necessary to a valid deed or mortgage. Reversed.

NOTE [from original report]. The cases on the subject of the homestead exemption down to 1862 will be found collected in 1 Am. Law Reg. (N. S.) pp. 641, 705. See, also, Cox v. Wilder [Case No. 3,308], and cases cited in note [In re Hook, Case No. 6,671; Smith v. Kehr, Id. 13,071; In re Cross, Id. 3,426; Rix v. Capitol Bank, Id. 11,869; In re Tertelling, Id. 13,842; In re Jones, Id. 7,445]; Bartholomew v. West [Id. 1,071].

An express relinquishment of the homestead right held not necessary, where it was not required by the statute. Babcock v. Hoey, 11 Iowa, 375; Pfeiffer v. Reihn, 13 Cal. 643.

But formal release or waiver is in some states required. Kitchell v. Burgwin, 21 Ill. 40, explained 23 Ill. 536; 26 Ill. 107, 150; 1 Am. Law Reg. (N. S.) 706, note.

---

## Case No. 3,427.

### In re CROSS.

[16 N. B. R. 294;[1] 25 Pittsb. Leg. J. 35; 5 Cent. Law J. 313.]

District Court, D. Indiana. Sept. 25, 1877.

APPLICATION BY BANKRUPT FOR DISCHARGE.

The bankrupt must apply for his discharge before the final report and discharge of the assignee.

GRESHAM, District Judge. In this case the bankrupt filed his petition for discharge. September 17, 1877. The assignee in the cause had rendered his final account, and received his discharge from the register November 1, 1876. The question in the case is made under the amendment to the bankrupt act approved July 26, 1876 (19 Stat. 102). That amendment provides that section 5108 of the Revised Statutes be amended to read as follows: "At any time after the expiration of six months from the adjudication of bankruptcy, or, if no debts have been proved against the bankrupt, or if no assets have come to the hands of the assignee, at any time after the expiration of sixty days, and before the final disposition of the cause, the bankrupt may apply to the court for a discharge from his debts." The amended provision is expressly extended to "all cases heretofore or hereafter commenced." The original provision on this subject, as in the section cited, differs from the amendment in this: Instead of the words, "before the final disposition of the cause," the original act reads in their stead, "within one year from the adjudication of bankruptcy." So that originally the bankrupt was required to apply for his discharge within a year after the adjudication, whereas, by the amendment, he is required to apply "before the final disposition of the cause."

What is meant in this amendment by the final disposition of the cause cannot be a matter of doubt. But two principal objects are contemplated by a proceeding in bankruptcy: 1. The administration and distribution of a bankrupt's estate. 2. The discharge of a bankrupt from his debts. It is plain the amendment does not contemplate the latter as the final disposition of the cause, for that is the part of the case yet to be disposed of.

[1] [Reprinted from 16 N. B. R. 294, by permission.]

The final settlement made by the assignee, and the discharge of that officer from his functions, constitute, within the meaning of this amendment, the final disposition of the bankruptcy. Under the act as it originally stood, this provision was variously interpreted. Congress, however, interposes to fix a new period, and declares that the bankrupt may ask for his discharge before the case is so disposed of, or, in other words, before the assignee has completed his administration and received his discharge. If any liberality of construction was indulged before this amendment, there seems to be no place for it now. Congress evidently intended to fix a limit within which a discharge could be asked for, and they very reasonably repealed the arbitrary limitation of one year, and substituted one not open to the objection that the estate remained unsettled—that is, that the period for applying for discharge must not be later than the final report and discharge of the assignee. Such, I think, is the only conclusion that can be reached, for it is the only one that gives any effect to the legislation of congress. This is substantially the view taken by the district court of the United States for the northern district of New York, and sustained on review by the circuit court for the same district, in Re Brightman & Losee [Case No. 1,878]. The application for discharge comes too late, and is therefore rejected.

---

## Case No. 3,428.

### CROSS v. The BELLONA.

[Bee, 193.] [1]

District Court, D. South Carolina. Jan., 1803.

#### MEASURE OF SALVAGE COMPENSATION.

Whatever may be the service rendered, court will never give more than one half by way of salvage; and will restore the remainder to owners. Less than one half may be awarded, according to circumstances.

The ship Bellona, of New York, sailed from Cadiz on the 2d September last, with a cargo of wine. She encountered several violent storms, in which she was dismasted, and had her rudder irons knocked off. In this state, with three feet water in the hold, she met at sea a schooner bound to Boston, from which they could obtain no supply of provisions, nor other assistance. But the master offered to take them into his schooner, and to land them in one of the ports to the eastward. The crew of the Bellona accepted the offer. On the 7th November following, she was met with in latitude 42, 40, longitude 63, by the brig John, Sanders, master, who put his mate, Brown, and two seamen into the Bellona, with a supply of provisions and other necessary articles. She had, at that time, three and a half feet water in her hold, her

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

hatches were open, and her rudder irons gone. Brown and the two seamen continued their endeavors to make a port, till the 30th November, when the libellant Cross boarded the Bellona in latitude 32, 39, longitude 68. Her stock of provisions consisted then of no more than thirty weight of beef, and as much of bread. Brown agreed with Cross that, upon his staying by the wreck, and assisting to get her into port, he should receive one half of the ship and cargo. Upon these conditions Cross remained with the Bellona, sent one seaman on board, and furnished her with all necessary supplies. He was with her when she arrived in this port, seventeen days after he fell in with her. It was proved that Sanders, who put the first three men on board, took out thirty-six casks of wine, and carried them with him to Salem.

BEE, District Judge. After arguing the merits of the respective salvors, a claim was interposed by the owners and underwriters resident in New York. Counsel were heard also on their behalf. Much ingenuity has been displayed as to the proportional service of the several salvors; but as they have agreed to divide equally whatever may be adjudged to them, I shall not rest upon that point. It is said that they are entitled to two thirds of the vessel and cargo. But the owners, by their counsel, as strenuously maintain that they will be amply compensated by a fourth; or, at most, a third part. It was admitted that essential service had been rendered. It is, indeed, highly improbable that the vessel would have reached land without the assistance of Sanders, who found her derelict; and the subsequent aid of Cross, who supplied her with necessaries, and towed her into this harbour.

The value of the property saved is considerable. 1 C. Rob. Adm. 1, 43, were quoted in favour of the salvors. Sir William Scott there says, that courts should not be desirous of reducing to one dead level, the various degrees of merit that must attend the circumstances of each particular case. He refers to a pretended universal rule of giving one half in every case. No more was contended for in that case; but, though no owners appeared, it was declared that the salvors were not entitled to a moiety, and it was determined accordingly. The case quoted by the counsel for the owners from 3 C. Rob. Adm. 355, is also inapplicable to this. There the services were rendered on land, and the crew of the William Beckford were on board, and assisted in saving her. In the case before me, the vessel was abandoned on the high seas, was found six or seven hundred miles from any land, in a disabled state, and at a tempestuous time of the year. I have always considered cases of derelict as different from other claims for salvage, and have invariably decreed one half by way of compensation. Circumstances may induce me, on future occasions, to give less: I would